[Docket No. 36]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

WILFREDO CUEVAS,

               Plaintiff,

     v.

CAMDEN IRON & METAL, INC.,
*et al.*,

               Defendants.

Civil A. No. 23-20830
(RMB/EAP)

**OPINION**

**APPEARANCES**:

Ari R. Karpf, Esq.
Jordyn Kopcow, Esq.
Benjamin David Salvina, Esq.
KARPF, KARPF & CERUTTI, P.C.
8 Interplex Dr., Ste. 210
Feasterville-Trevose, PA 19053

    *Attorneys for Plaintiff Wilfredo Cuevas*

Benjamin S. Teris, Esq.
PIERSON FERDINAND, LLP
100 Overlook Center, 2nd Floor
Princeton, NJ 08540

Sidney R. Steinberg
PIERSON FERDINAND, LLP
333 E. Lancaster Ave. #321
Wynnewood, PA 19096

    *Attorneys for Defendants Camden Iron & Metal, Inc.; EMR Advanced Recycling, LLC;*
    *My Auto Store, LLC; and EMR (USA Holdings), Inc.*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon the Motion for Summary Judgment filed by Defendants Camden Iron & Metal Inc. d/b/a EMR ("EMR"), EMR Advanced Recycling, LLC ("Advanced Recycling"); My Auto Store ("MAS"); and EMR (USA Holdings), Inc. (collectively, the "Defendants"). [Defs.' Br. (Docket No. 36-2).] Plaintiff Wilfredo Cuevas ("Plaintiff" or "Mr. Cuevas") has opposed the motion. [Pl.'s Opp'n (Docket No. 39).] Defendants submitted a reply in further support of the Motion. [Defs.' Reply (Docket No. 42).] The Court has considered the parties' submissions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, the Court will **GRANT**, in part, and **DENY**, in part, Defendants' Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

Mr. Cuevas is a sixty-year-old Latino man. [Pl.'s SMF ¶ 1 (Docket No. 39-2).][1] He speaks both English and Spanish but is not able to read or write in either language. [*Id.* ¶¶ 2, 3.] He was employed as a general laborer at EMR's Innovative Recovery Products facility ("IRP") in Camden, New Jersey from July 15, 2022 until October 3, 2022. [*Id.* ¶ 4.] While in this position, Plaintiff claims he was subjected to racial discrimination and retaliation, as well as a hostile work environment. He then

---

[1] The material facts underlying this matter are drawn from the parties' respective statements of material facts ("SMF") [Defs.' SMF (Docket No. 36-1); Pl.'s SMF (Docket No. 39-2)], where admitted, as well as the exhibits of record.

left IRP and began working as a third-class dismantler at Defendants' MAS business in Philadelphia, Pennsylvania beginning on October 24, 2022.  He remained in this position until his departure from the company.  While at MAS, Plaintiff claims he was subjected to disability discrimination and retaliation, a hostile work environment, and a failure to accommodate his disability.

### A. Plaintiff's Work at IRP

Plaintiff was employed by Advanced Recycling as a General Laborer at IRP from July to October 2022.  Plaintiff worked the second shift in a section called "3DS," which was near the "A-line" and "B-line" sections.  [Pl.'s SMF ¶ 9.]  The assistant general manager for IRP during this time was Todd Valentine, who was responsible for overseeing IRP operations and supervised all IRP employees.  [*Id.* ¶ 8.] Jose Mario Rodriguez, who speaks both English and Spanish, also supervised employees from all three IRP sections as well as the mechanics.  [*Id.* ¶¶ 11, 12.]  In August 2022, Bruce King was promoted to second shift IRP Production Separation Supervisor.  Mr. King was responsible for supervising the 3DS employees.  [*Id.* ¶ 13.]

Mr. King is a Black man who does not speak or understand Spanish.  [*Id.* ¶ 14.] The majority of second shift employees in the 3DS, A-line, and B-line sections were Latino.  And roughly half of the Latino employees spoke Spanish only.  [*Id.* ¶ 10; Defs.' SMF ¶ 7.]   To facilitate communication between Mr. King and the Spanish-speaking second shift employees, Mr. Cuevas helped translate between Mr. King and the employees.  [Pl.'s SMF ¶ 14; Defs.' SMF ¶ 9.]

Plaintiff testified that he believed the Latino employees treated Mr. King in a discriminatory and hostile manner and differently than Mr. Rodriguez, the Latino supervisor. According to Plaintiff, certain employees pretended not to understand English, ignored Mr. King's instructions, interfered with walkie talk communications by creating static when Mr. King attempted to communicate with employees, and referred to Mr. King as "el moreno," meaning "the Black guy" in Spanish. [Pl. 6/19/24 Dep. Tr. 70:1-5 (Docket No. 39-6); Pl. 10/28/24 Dep. Tr. 49:4-12 (Docket No. 39-8); Rodriguez Dep. Tr. 38:12-24 (Docket No. 39-11).]

Plaintiff claims that "within just days of Plaintiff translating for King," other Latino employees began harassing him due to his association with Mr. King. [Pl.'s SMF ¶ 16.] Mr. Cuevas testified that his coworkers, whose faces he saw but names he did not know, referred to him as "rata," Spanish for "rat," while laughing. [Pl. 6/19/24 Dep. Tr. 78:4-79:21.] He also testified that when he walked by, "they" – who he could not see, let alone identify – would drop "things" on him from several floors above and that he got hit with "dirt." [*Id.* 88:3-21.] He did not specify whether this happened once or more. Overall, Mr. Cuevas felt that the Latino employees did not respect him because of his work relationship with Mr. King, a Black man in a predominantly Latino work environment. [*Id.* 65:11-17.] Mr. Cuevas attributed this perceived disrespect to possible "jealousy" or "something else." [*Id.* 62:10-17, 74:16-18, 83:17-19.] In response, Mr. Cuevas "mind[ed] [his] own business." He testified: "I mind my own business, I do my job what I go to do and that's it, go back home, come back the next day." [*Id.* 65:11-17.]

4

At some point, Mr. Cuevas shared "what was going on" with Mr. Valentine, explaining that the other workers were "disrespecting" him and Mr. King and calling him a "rat." [Defs.' SMF ¶¶ 18, 19.] Several days later, Mr. King and Mr. Valentine called an all-employee meeting where the supervisors expressed that they wanted the employees to work cooperatively and respectfully. [Pl.'s SMF ¶ 18.] Sometime shortly thereafter, Mr. Rodriguez asked Plaintiff why he was helping "the Black guy," referring to Mr. King, rather than helping "la gente," Spanish for "the people." [Pl. 6/19/24 Dep. Tr. 62:18-25; Pl. 10/28/24 Dep. Tr. 45:16-23, 99:6-17.] Mr. Cuevas responded that he was just trying to help everyone. Mr. Rodriguez "started walking away laughing." [Pl. 6/19/24 Dep. Tr. 62:22-63:1; *see also id.* 74:11-21.] Plaintiff claims that another IRP employee, identified by Plaintiff only as Alex, also questioned why he was helping "the Black guy" and told him that "we got to be together, the Spanish people." [Pl.'s SMF ¶ 25.]

In early October 2022, Mr. King asked Plaintiff to translate for him and a mechanic named Felix about a broken machine. When Felix approached while holding a large wrench and another worker yelled out to Mr. King to "watch [his] back." Felix told Mr. Cuevas in Spanish to tell Mr. King that Mr. Rodriguez was his boss, not Mr. King. [Pl. 6/19/24 Dep. Tr. 63:2-64:12.] Mr. King responded that Felix "better go back to work and fix that machine." Felix returned to work "and kept walking laughing." [*Id.* 63:17-21.] Mr. Rodriguez later arrived to assist with the machine, also "laughing." [*Id.* 64:6-12.] Mr. King reported this incident to Mr. Valentine. [Pl.'s SMF ¶ 40.]

Plaintiff also met with Mr. Valentine and explained that the other employees continued to disrespect him and Mr. King.  Mr. Valentine responded that he had to let Mr. Cuevas go because of "too many problems."  [Defs.' SMF ¶ 23.][2]  When Plaintiff asked Mr. Valentine if he was really terminating him, Mr. Valentine responded that he would "sweep it under the rug" and assured Plaintiff that he would contact someone higher up at the company to get Mr. Cuevas a new position elsewhere in the organization.  [Pl.'s SMF ¶ 45.][3]  Mr. Valentine then told Dr. Charles Atkins, the Director of Employee Assistance, that Plaintiff was looking for different employment because he was having issues with other workers at IRP.  [*Id.* ¶ 46.]

Plaintiff met with Dr. Atkins on October 3, 2023 and explained his departure from IRP and the difficulties he faced with his coworkers.  Dr. Atkins's notes memorializing the conversation state that Mr. Cuevas described the wrench incident between Mr. King and Felix and that "Latino co-workers" would cause static on the

---

[2]  Plaintiff testified that he also gave Mr. Valentine a doctor's note relating to an infection in his foot.  It is unclear when it was given to Mr. Valentine.  At times, Plaintiff testified that he gave Mr. Valentine the note during the same meeting in which he was terminated.  [Pl. 6/19/24 Dep. Tr. 80:2-11; Pl. 10/28/24 Dep. Tr. 40:12-41:17.]  But at other times, he testified that it was during a separate meeting. [Pl. 6/19/24 Dep. Tr. 97:6-24, 99:8-18, 101:1-8.]  Regardless, Plaintiff expressly stated he did not believe that the doctor's note had anything to do with his termination from IRP.  [*Id.* 101:1-12.]  This is consistent with Plaintiff's pleadings and brief, which do not even mention this exchange.  [*See generally* Compl.; Pl.'s Opp'n.]  As such, the Court does not address this exchange in its analysis below.

[3]  Defendants dispute that Plaintiff was "fired" and apparently have "records establishing that he quit."  [Defs.' SMF ¶ 23 n.1.]  Perplexingly, Defendants have not proffered this evidence on summary judgment.  Instead, they accept "for purposes of this motion only" that Plaintiff's testimony that he was fired is true.  [*Id.*]

walkie-talkies when Mr. King was trying to communicate.  Plaintiff also expressed concerns that certain employees were members of a gang and that men would have sex in the facility yard during the overnight shift.  Notably, the notes do not contain any references to racial or other discrimination.  [Atkins Log (Docket No. 39-9).] Thereafter, Dr. Atkins assisted Plaintiff in finding a new job placement at Defendants' MAS business.  [Pl.'s SMF ¶¶ 53, 54.]

B. **Plaintiff's Work at MAS**

Mr. Cuevas was rehired by Defendants as a third-class dismantler at MAS on October 24, 2022.  [Pl.'s SMF ¶ 55; Defs.' SMF ¶ 33.]  His primary job responsibilities involved dismantling vehicles to salvage valuable parts and materials, sorting and organizing salvaged materials, operating hand and power tools, and maintaining a clean work area.  [Job Description (Docket No. 36-13).]  Plaintiff testified that the workers would sweep or otherwise clean up "if there was spare time" or there was "nothing to do."  [Pl. 10/28/24 Dep. Tr. 79:18-80:14.]  When he began at MAS, Plaintiff began a union probationary period and did not have the seniority he previously had at IRP.  [*Id.* 60:21-63:9.]

Prior to his employment with Defendants, Mr. Cuevas developed a hernia. [Medical Records (Docket No. 39-19).]  In December 2022, the hernia worsened and required surgery.  Plaintiff believes the hernia worsened throughout his employment at MAS given the significant physical demands of his job.  [Pl. 10/28/24 Dep. Tr. 38:1-16.]  Prior to undergoing surgery, he informed his supervisor at MAS, George Rohoja, about the hernia.  [Pl.'s SMF ¶ 59.]  Plaintiff underwent hernia repair surgery

on January 24, 2023. [Defs.' SMF ¶ 37.] Defendants' benefits vendor Symetra approved Plaintiff's request for short-term disability medical leave through March 13, 2023. [Pl.'s SMF ¶ 62.] Mr. Cuevas, however, attempted to return to work around February 13, 2023. Defendants' human resources manager, Ebony Mosley, instructed Plaintiff's manager to send him home with directions that he could not return to work without a note from a physician clearing him for work with no restrictions. [Pl.'s SMF ¶ 64.]

Mr. Cuevas submitted a note from his doctor dated February 15, 2023, clearing him for work as of February 27, 2023 with light duty restrictions for two weeks. [Pl.'s SMF ¶ 65; Defs.' SMF ¶ 38.] Plaintiff believes he could have returned to work to "sweep, stuff like that." [Pl. 10/28/24 Dep. Tr. 79:9-14.] But Defendants did not permit him to return to work until he was cleared for work without restrictions. [Mosley Email (Docket No. 36-17).] Plaintiff filed a grievance through his union, which Ms. Mosley denied, stating that "The employee has an out of work injury and light duty cannot be accommodated." [Pl.'s SMF ¶¶ 68, 69.] Instead, Plaintiff was instructed to continue his leave of absence. [Mosley Dep. Tr. 40:23-41:3 (Docket No. 39-22).] At her deposition, Ms. Mosley testified that there are times where employees with out of work injuries may be accommodated with light duty work and that she works with Defendants' leave vendors to develop accommodations for employees as needed. [*Id.* 42:3-43:4, 44:19-23.]

After submitting a doctor's note dated March 13, 2023, clearing him to work without restrictions as of March 15, Mr. Cuevas returned to work. [Pl.'s SMF ¶ 71.]

Upon his return to work, Mr. Cuevas was physically capable of performing all parts of his job without accommodations and he never informed any of his supervisors otherwise. [Pl. 10/28/24 Dep. Tr. 90:20-91:9, 92:24-93:6.] Thereafter, Mr. Cuevas claims he was not permitted to use a forklift or work as a team with coworkers to complete strenuous tasks. [*Id.* 38:11-16; Interrogatory Nos. 9, 10, 13 (Docket No. 39-12).] Plaintiff claims this was due to discriminatory animus.

Mr. Cuevas then called out of work "sick" several days of work in the latter part of March and early April 2023. [Call-Out Records (Docket No. 36-19).] Mr. Cuevas cannot recall why he called out on any of those dates. [Defs.' SMF ¶ 47.] Mr. Cuevas did not return to work after April 4, 2023. [Payroll Records (Docket No. 36-20).] On April 25, 2023, Ms. Mosley, via MAS's FMLA coordinator, sent Mr. Cuevas a form to be completed if he wished to go out on another leave. [Leave Letter (Docket No. 36-21).] Mr. Cuevas does not recall seeing that paperwork. [Pl.'s SMF ¶ 81; Defs.' SMF ¶ 51.]

On April 27, 2023, Plaintiff met with Ms. Mosley in person and informed her that he felt like his surgical incision was reopening. [Defs.' SMF ¶ 52.] At some point prior to this, Mr. Cuevas had informed his supervisor of this discomfort as well. [Mosley Dep. Tr. 35:20-36:8.] Ms. Mosley advised Mr. Cuevas to see a doctor if his incision pain was impacting his ability to work because the latest doctor's note confirmed that Mr. Cuevas was able to return to work without restrictions. Rather than doing so, Mr. Cuevas told Ms. Mosley that he would quit. She requested that

9

Mr. Cuevas put his resignation in writing. [*Id.* 49:15-54:11.] Plaintiff then sent Ms. Mosley the following text message:

> My name is Wilfredo Cuevas the reason why I'm quitting I asked for help when I got my operation I went to [Luis Cartagena] for [light] work they told me no I told him I had an operation didn't care I didn't know what to do so I quit.

[Text Message (Docket No. 39-21).] Plaintiff claims that he was forced to resign because Defendants refused to accommodate his disability.

## II. PROCEDURAL HISTORY

Based upon these facts, Mr. Cuevas filed suit against Defendants on October 2, 2023. His Complaint sets forth hostile work environment and retaliation claims relating to racial or national origin animus in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I); 42 U.S.C. § 1981 ("Section 1981") (Count II); and the New Jersey Law Against Discrimination ("NJLAD") (Count III). The Complaint further sets forth hostile work environment, discrimination, failure to accommodate, and retaliation claims related to Plaintiff's actual or perceived disability in violation of the Americans with Disabilities Act ("ADA") (Count IV) and NJLAD (Count V). [Compl. (Docket No. 1).]

Upon the conclusion of discovery, Defendants filed the instant Motion for Summary Judgment. The briefing is now complete, and the motion is ripe for determination.

## III.    LEGAL STANDARD

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In determining whether a genuine dispute of material fact exists, "all evidence is viewed in the light most favorable to the non-moving party and 'all justifiable inferences are to be drawn in his favor.'" *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220 (3d Cir. 2024) (quoting *Anderson*, 477 U.S. at 255).  A "mere scintilla of evidence," however, does not generate a genuine dispute of material fact.  *Anderson*, 477 U.S. at 252.

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing FED. R. CIV. P. 56(e)).   The nonmovant's burden is rigorous.  The nonmovant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat

summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")). If the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial,' then summary judgment is appropriate for the moving party." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

## IV.   DISCUSSION

Mr. Cuevas claims that he suffered mistreatment while employed by Defendants relating to discrimination based on race and/or national origin, as well as his actual or perceived disability. The Court addresses these separately.

### A. <u>Racial Discrimination Claims</u>

Plaintiff claims that Defendants retaliated against him and subjected him to a hostile work environment for assisting Mr. King with translation and for reporting racial discrimination by certain Latino employees against Mr. King. Counts I, II, and III allege retaliation and hostile work environment claims in violation of Title VII, Section 1981, and NJLAD, respectively. The same legal standards apply to retaliation and hostile work environment claims under Title VII, Section 1981, and NJLAD. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); *Taylor v. Metzger*, 706 A.2d 685, 689 (N.J. 1998).

Therefore, as is routinely done, the Court analyzes these claims together and for ease of reference refers largely to Title VII in its discussion.

### i.    Hostile Work Environment

"[T]he *sine qua non* of a hostile environment claim is 'a workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 421 (D.N.J. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)). Accordingly, to establish a hostile work environment, an employee must prove that: (1) the employee suffered intentional discrimination on the basis of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). The first four elements of the claim prove that a hostile workplace existed, while the final element imputes liability to the employer. *Mandel*, 706 F.3d at 167.

Plaintiff claims he was subject to severe and pervasive harassment by his Latino coworkers because he helped their Black supervisor, Mr. King. To support his claim, he points to his own testimony that Mr. Rodriguez and other Latino employees would on occasion refer to Mr. King as "moreno" or "the Black guy," and that Mr. Rodriguez once asked him why he was "helping this Black guy," referring to the translation

assistance Plaintiff provided for Mr. King, while laughing.  [Pl. 6/19/24 Dep. Tr. 62:18-25; Pl. 10/28/24 Dep. Tr. 45:16-23, 99:6-17.]   Plaintiff further testified certain unknown Latino employees would on unspecified occasions call him a rat in Spanish while laughing.   He also testified that on unspecified occasions certain unknown employees – again, whom he cannot identify because he did not see them – dropped "things" or "dirt" on him from several floors above.  [Pl. 6/19/24 Dep. Tr. 78:4-79:21; 88:3-21.]   Plaintiff's testimony as to these events is entirely non-specific.  Indeed, he testified that he did not even see anyone do this.  Finally, he testified that another Latino employee approached Mr. King with a wrench in hand in what Plaintiff felt was a menacing way – despite the employee ultimately walking away laughing – and told Mr. King that he was not his boss.  [*Id.* 63:2-64:12.]

The Court considers "the overall scenario" in its analysis.  *Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005).  This includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Unquestionably, this was a workplace riddled with "interpersonal workplace strife."  But this is insufficient to establish the severe or pervasive conduct necessary to prove a hostile work environment.  *Goodwin v. Univ. of Pennsylvania*, No. 23-3211, 2024 WL 4678877, at *4 (3d Cir. Nov. 5, 2024).  Indeed, "Title VII is not intended as a 'general civility code,' and requires that 'conduct must be extreme' to constitute the

kind of 'change in the terms and conditions of employment' the statute was intended to target." *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J., dissenting) ("Title VII imposes no 'general civility code.' It does not reach 'the ordinary tribulations of the workplace,' for example, 'sporadic use of abusive language' or generally boorish conduct.") (internal citations omitted).

"'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver*, 420 F.3d at 262 (quoting *Faragher*, 524 U.S. at 788). Referring to Mr. King as "the Black guy" may be racially insensitive. And using racial epithets is certainly contemptible (though Plaintiff did not testify that he heard anyone use such slurs). Yet, based on the record before the Court, these comments do not rise to the level of severity required. *Qin*, 100 F.4th at 471; *see also Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (holding that explicitly racial comments were not sufficiently severe to establish a hostile work environment). "Title VII is not violated by the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness." *Park v. Sec'y U.S. Dep't of Veterans Affs.*, 594 F. App'x 747, 751 (3d Cir. 2014) (quoting *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 280 (3d Cir. 2001)).

Additionally, the bulk of Plaintiff's complaints relate to comments made to Mr. King, not himself. Yet "comments referring to other individuals that were merely

overheard by [Plaintiff] are the sorts of "offhanded comments and isolated incidents" that the Supreme Court has "cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver*, 420 F.3d at 263 (citing *Faragher*, 524 U.S. at 788).

The few incidents that directly involved Plaintiff, such as being called "rata," the unspecified incidents (in terms of both details and frequency) of having "things" or "dirt" dropped on him, and his coworkers shunning him at lunch, as boorish as they are, are minor and isolated examples of workplace conduct that are not covered by Title VII, similar to "the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788. Indeed, Plaintiff testified that the employees laughed as they called him a rat, indicating mere teasing and insensitive jokes. And finally, there is no evidence that the alleged harassment unreasonably interfered with Plaintiff's work performance. Indeed, Plaintiff testified that it did not: "I mind my own business. I do my job what I go to do and that's it, go back home, come back the next day." [Pl. 6/19/24 Dep. Tr. 65:11-17.]

Having assessed the totality of the circumstances, the Court finds that the undisputed facts establish that the comments and conduct that Plaintiff was exposed to – while rude and offensive at times, to be sure – do not rise to the level of pervasive or severe harassment. The evidence simply does not support a finding that Plaintiff's workplace was so "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Morgan*, 536 U.S. at 116 (cleaned up).

Accordingly, the Court will grant summary judgment on Plaintiff's hostile work environment claims.

### ii.    Retaliation

The anti-retaliation provision of Title VII prohibits an employer from discriminating against an employee who has "opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to the same. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation in the employment context a Plaintiff must establish that (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between the protected activity and the adverse employment action. *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006). For the reasons discussed below, the Court finds that summary judgment is appropriate because Plaintiff cannot establish that he engaged in protected activity.

"Thus, only complaints about discrimination prohibited by [law] . . . constitute protected activity." *Qin*, 100 F.4th at 476. Protected activity may include informal protests and complaints to management, so long as such complaints are not equivocal or vague. *Id.* (citing *Moore*, 461 F.3d at 341). Critically, the employee must hold "an objectively reasonable belief, in good faith, that the activity [he] oppose[s]" violates the applicable anti-discrimination statute. *Moore*, 461 F.3d at 341. To be sure, a plaintiff engages in protected activity where he complains of discrimination against others, not just against himself. *See Moore*, 461 F.3d at 342. Similarly, a plaintiff may

17

engage in protected activity where he opposes "discrimination because of [his] association with a person of another race." *Kengerski v. Harper*, 6 F.4th 531, 537 (3d Cir. 2021).

To succeed on a retaliation claim, "a plaintiff need not show that his working environment in hindsight was actually hostile, only that he held an objectively reasonable belief that it was. *Id.* That being said, "a complaint about workplace behavior that is so minor and isolated that it could not 'remotely be considered extremely serious'—that is not within some striking distance of an actual hostile work environment—is not protected because '[n]o reasonable person could have believed that" it was unlawful. *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). And "[g]eneral complaints of unfair treatment" do not amount to protected activity. *Qin*, 100 F.4th at 476.

The Court has scoured the record in this case and simply does not find evidence from which a jury could properly find that Plaintiff's complaints to Mr. Valentine or Dr. Atkins constituted protected activity under the applicable case law. First, there is no evidence that Plaintiff made unequivocal complaints to management about racial discrimination. Plaintiff's testimony suggests exactly the opposite, namely that his complaints were vague and equivocal. He testified that he spoke to Mr. Valentine about "what was going on" – without elaborating on what that was – and complained that other employees were "disrespecting" him and Mr. King and calling him a "rat." [Defs.' SMF ¶¶ 18, 19.] He attributed this perceived disrespect to possible "jealousy" or "something else," not racial animus. [Pl. 6/19/24 Dep. Tr. 62:10-17, 74:16-18,

83:17-19.]    Dr. Atkins notes similarly do not report any complaints of racial discrimination, despite documenting numerous other complaints unrelated to racial discrimination.    [Atkins Log.]    These "[g]eneral complaints of unfair treatment" do not amount to protected activity.    *Qin*, 100 F.4th at 476.

Even if this Court credits Plaintiff's claim that he explicitly complained to his supervisors about Mr. King being called "the Black guy," as well as other employees dropping things on him and calling him a rat, these complaints relate to "minor and isolated" behavior – although certainly "boorish" and "discourteous" – that no reasonable person would believe was unlawful.    *See Kengerski*, 6 F.4th at 537.    There is no evidence from which a reasonable jury could find that Plaintiff engaged in protected activity.    As a result, his retaliation claim fails.

### B. <u>Disability Discrimination Claims</u>

Plaintiff claims that, upon returning to work after a hernia repair surgery, he was subjected to discrimination, retaliation, and a hostile work environment because of his disability.    Plaintiff also claims that Defendants failed to provide him with reasonable accommodations.    Counts I, II, and III assert each of these claims in violation of the ADA and NJLAD, respectively.    The same general legal standards apply to claims under the ADA and NJLAD.    *See Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 70 (3d Cir. 1996) ("the ADA and [NJ]LAD claims are governed by the same standards.").    The Court thus analyzes Plaintiff's ADA and NJLAD claims together and, for ease of reference, refers largely to the ADA in its discussion.

19

### i.    Hostile Work Environment

Much like the standard for a hostile work environment claim outlined above in connection with Title VII, "[t]o succeed on a claim for harassment due to a hostile work environment under the ADA and NJLAD, a plaintiff must show, among other things, that 'the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment.'" *Vanhook v. Cooper Health Sys.*, No. 21-2213, 2022 WL 990220, at *4 (3d Cir. Mar. 31, 2022) (quoting *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999); citing *Castleberry*, 863 F.3d at 263–64; *Shepherd v. Hunterdon Dev. Ctr.*, 803 A.2d 611, 624–26 (N.J. 2002)).[4]   "Because the hostile work environment test is disjunctive, 'some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264 (cleaned up).

Courts must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

---

[4]    A plaintiff must establish the following elements to prevail on a hostile work environment claim under the ADA: (1) he is a qualified individual with a disability under the ADA; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that his employer knew or should have known of the harassment and failed to take prompt effective remedial action. *Broadnax v. Sec'y United States Dep't of Veterans Affs.*, 860 F. App'x 800, 804 (3d Cir. 2021) (citing *Walton*, 168 F.3d at 667).

an employee's work performance," in determining whether the alleged harassment was sufficiently severe or pervasive. *Broadnax*, 860 F. App'x at 804 (citing *Harris*, 510 U.S. at 23). "The environment must be both perceived to be hostile by the plaintiff and shown to be objectively hostile." *Id.*

Plaintiff claims that the "harsh" treatment he received upon returning to work after his surgery was "intolerable" and constituted a hostile work environment. [*See* Pl.'s Opp'n at 37.] Plaintiff requested to come back to work early from his approved leave on light duty restrictions. [Pl.'s SMF ¶ 65.] This request was denied. [*Id.* ¶¶ 68–69.] Plaintiff claims that once he returned to work without restrictions, his supervisor forbade him from using forklifts and would make him work alone, though he cannot recall specific instances of either. [Pl. 10/28/24 Dep. Tr. 38:11-16; Interrogatory Nos. 9, 10, 13.] Then, Plaintiff told his supervisor and Ms. Mosley that his surgical incision felt like it was opening while he worked. [Defs.' SMF ¶ 52; Mosley Dep. Tr. 35:20-36:8.] But Plaintiff did not request an accommodation for that. In fact, after Ms. Mosley suggested he see his doctor, he refused and quit. [Text Message; Mosley Dep. Tr. 49:15-54:11.]

Having examined the totality of these circumstances, the Court finds that they do not rise to the level of severe or pervasive harassment. Frankly, the behavior Plaintiff complains about "cannot fairly be characterized as 'unwelcome harassment'" at all. *See Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 96 (3d Cir. 2020). Plaintiff has proffered no evidence whatsoever about the frequency of any alleged harassment. For example, he does not recall the specific times or dates of when his

supervisor allegedly did not permit him to work with the crew or use a forklift. [Interrogatory Nos. 9, 10.]   There is no evidence at all of what specifically his supervisor told him.   So, it is impossible for the Court to find that his supervisor's comments were severe, threatening, or humiliating.   Plaintiff's testimony suggests – at most – some "interpersonal workplace strife," which again is plainly insufficient to prove severe or pervasive conduct.  *Goodwin*, 2024 WL 4678877, at *4.

What's more, there is no evidence from which a jury could find that any purported harassment is connected to Plaintiff's disability.   Indeed, Plaintiff himself admits that he does not know why "they didn't want me to drive a forklift."   [Pl. 10/28/24 Dep. Tr. 38:11-16.]   "Given the absence of a nexus between that poor relationship [between Plaintiff and his supervisor] and [Plaintiff's] disability, examples of how that poor relationship manifested itself cannot support an ADA hostile workplace claim."  *See Wright*, 822 F. App'x at 96; *see also Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.").

And to the extent that Plaintiff claims that Defendants' refusal to allow him to come back to work with light duty restrictions two weeks earlier than initially planned created a hostile work environment, the Court flatly rejects that argument.   A single, isolated incident is insufficient unless it is extremely serious.   *Vanhook*, 2022 WL 990220, at *5 (citing *Faragher*, 524 U.S. at 788).   No reasonable jury could find that this one incident – especially when it is undisputed that Plaintiff was permitted to continue his protected leave and returned to work shortly thereafter without

22

restrictions – was so severe that it created a hostile work environment.  *See Douglas v. Kensington Cmty. Corp. for Individual Dignity*, 775 F. Supp. 3d 881, 899 (E.D. Pa. 2025) ("involuntary medical leave," rather than requested accommodation, "is not enough, by itself, to allow this Court to draw the reasonable inference that Defendant subjected her to a hostile work environment.").   Accordingly, Plaintiff's hostile work environment claims under the ADA and the NJLAD must be dismissed.

### ii.    Discrimination

To establish a prima facie case of disability discrimination under the ADA and NJLAD, a plaintiff must establish that (1) he is disabled within the meaning of the statute;[5] (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998)).[6]

Plaintiff's disability discrimination claim fails because he cannot establish that he suffered an adverse employment action due to disability discrimination.   It is

---

[5]    "The NJLAD refers to 'handicap,' but defines handicap as a disability." *Stewart v. Cnty. of Salem*, 274 F. Supp. 3d 254, 259 (D.N.J. 2017) (collecting cases).

[6]    "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Id.*  The Court will address the failure to provide reasonable accommodations claim separately below.

undisputed that Plaintiff resigned from his position at MAS.  Plaintiff contends, however, that he was constructively discharged.[7]  To establish constructive discharge, however, Plaintiff "must show both a hostile work environment and that 'the abusive working environment became so intolerable that . . . resignation qualified as a fitting response.'"  *Lewis v. Univ. of Pennsylvania*, 779 F. App'x 920, 922 (3d Cir. 2019) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 133–34 (2004)); *see also Anastasia v. Cushman Wakefield*, 455 F. App'x 236, 240–41 (3d Cir. 2011) ("constructive discharge requires not merely severe or pervasive conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it.").  "The test is objective and looks to whether 'a reasonable person in the employee's position would have felt compelled to resign.'"  *Lewis*, 779 F. App'x at 922 (quoting *Suders*, 542 U.S. at 141).

The Court has already concluded that Plaintiff cannot establish that he suffered conduct that was sufficiently "severe or pervasive" to establish a hostile work environment claim.  *See supra* Section IV.B.i.  Additionally, in determining "whether an employer's failure to accommodate rises to the level of a constructive discharge, courts often look to whether the employee repeatedly requested accommodation and that request was both denied and no reasonable alternative was offered."  *Lett v. Se.*

---

[7]    The only adverse action Plaintiff contends he suffered in connection with his disability discrimination claim is his purported constructive discharge.  He does not argue that Defendants' refusal to permit him to return to work early on light duty constitutes an adverse employment action in the context of this claim.  The Court nonetheless considers this in its analysis of Plaintiff's failure to accommodate claim.

*Pennsylvania Transportation Auth.*, 2022 WL 4542093, at *14 (E.D. Pa. Sept. 27, 2022) (collecting cases). Plaintiff requested one accommodation that was denied: light duty for two weeks. Instead, he was permitted to continue his leave until he was cleared to return to work without restrictions. This does not amount to a constructive discharge. As a result, Plaintiff cannot establish that he suffered an adverse employment action, and his disability discrimination claims under the ADA and the NJLAD must be dismissed.[8]

### iii. Failure to Accommodate

An employer must make reasonable accommodations to an employee's "known" disability. 42 U.S.C. § 12112(b)(5)(A); *Taylor*, 184 F.3d at 311. "What

---

[8]    The Court observes without deciding, as Defendants have not made the argument, that Plaintiff's disability discrimination claim may likewise fail because Plaintiff cannot establish that he was qualified to perform his job. Plaintiff appeared for work only a handful of times between his return to work on March 15 and his resignation on April 27, 2023. He called out sick for reasons he cannot recall on a number of days and his payroll records establish that he did not work at all after April 4, 2023. [Call-Out Records; Payroll Records.] The call-out records show that he last called out sick on April 10; but the remainder of his absences through his resignation appear to be unexcused. "It should not require saying that generally attendance is a requirement of a job. Not surprisingly, courts are in agreement on this point." *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 124 (D.N.J. 2020) (collecting cases); *see also Santiago v. Temple Univ.*, 739 F. Supp. 974, 979 (E.D. Pa. 1990), *aff'd*, 928 F.2d 396 (3d Cir. 1991) ("attendance is necessarily the fundamental prerequisite to job qualification"). Plaintiff's job duties required him to be physically present at work dismantling vehicles, sorting and organizing salvaged materials, and operating machinery. [Job Description.] Regular attendance was "undoubtedly an inherent qualification of Plaintiff's job description." *Marsh*, 455 F. Supp. 3d at 124–25 (finding plaintiff was unqualified where "attendance is key to Plaintiff's job duties" and Plaintiff had "history of unexcused absenteeism indicat[ing] an inability to attend work on a regular basis").

matters under the ADA are not formalisms about the manner of the request [for accommodation], but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability *and desire for an accommodation*." *Taylor*, 184 F.3d at 313 (emphasis added). While such notice need not be in writing or "formally invoke the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability." *Id.*

"An employer's failure to engage in a good-faith interactive process with the employee constitutes a failure to accommodate under the ADA." *Soutner v. Penn State Health*, 841 F. App'x 409, 415 (3d Cir. 2021) (citing *Taylor*, 184 F.3d at 312–13). To establish a failure to engage in the interactive process, a plaintiff must demonstrate that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (quoting *Taylor*, 184 F.3d at 319–20). An employer may demonstrate "their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor*, 184 F.3d at 317.

It is undisputed that while on approved medical leave following his hernia repair surgery, Plaintiff submitted a doctor's note clearing him to return to work with light duty restrictions for two weeks.  [Pl.'s SMF ¶ 65; Defs.' SMF ¶ 38.]  It is also undisputed that this request was flat out denied.  Plaintiff filed a grievance with his union requesting compensation for the days he was cleared for light duty but prohibited from returning to work with accommodations.  The grievance was denied with the note "The employee has an out of work injury and light duty work cannot be accommodated."  [Pl.'s SMF ¶¶ 68, 69.]  Yet, Ms. Mosley testified that there are times where employees who are not injured on the job may be accommodated with light duty work.  [Mosley Dep. Tr. 42:3-43:4.]  She also testified that she at times will work with Defendants' third-party vendor to develop accommodations for employees who have requested them.  [*Id.* 44:19-23.]  Yet there is no explanation here why she did not do so for Mr. Cuevas.

To be sure, the ADA does not "require an employer to provide a disabled employee with the accommodation of [his] choosing."  *Diaz v. City of Philadelphia*, 565 F. App'x 102, 106 (3d Cir. 2014).  It does, however, require a good faith interactive process, which is missing in this record.  There is no evidence that Defendants engaged in any good faith interactive process.  *See Taylor*, 184 F.3d at 317 (listing the ways in which an employer may show its good faith).  Ms. Mosley did not meet with Plaintiff to discuss his request and available alternatives.  She did not request further information on his limitations.  She did not discuss available alternatives to his requested accommodation.  This raises at least a genuine dispute of material fact as to

whether Defendants failed to engage in the interactive process with Plaintiff.  *See id.*  Accordingly, the Court will deny summary judgment as to Plaintiff's failure to accommodate claims insofar as they relate to the request for two weeks of light duty accommodations.

Plaintiff argues that he made a *second* request for reasonable accommodations that was ignored.  But the record plainly does not support that.  There is no evidence in the record that Plaintiff requested any accommodations for his known disability after he returned to work without restrictions on March 15.  While Plaintiff may have advised Mr. Cartagena and Ms. Mosley that he was experiencing discomfort at his surgical incision site, this alone is insufficient.  *Taylor*, 184 F.3d at 313 (employer must be aware of "both the disability *and desire for an accommodation*.") (emphasis added).  Indeed, Plaintiff himself conceded that once he returned to work, he was physically able to perform all parts of his job at all times without accommodations and that he never informed any of his supervisors otherwise.  [Pl. 10/28/24 Dep. Tr. 90:20-91:9, 92:24-93:6.]

"No reasonable factfinder could conclude on this record that [Defendants] could have been fairly said to have been on notice of Plaintiff's desire for an accommodation."  *Devico v. Genesis Healthcare, LLC*, 2019 WL 6318636, at *7 (D.N.J. Nov. 26, 2019) (citing *Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000)).  What's more, Ms. Mosley told Plaintiff he could submit a doctor's note if he needed leave or accommodations, and Plaintiff chose to quit rather than do so.  [Mosley Dep. Tr. 49:15-54:11.]  Thus, even if Defendants had been on notice of a request for an

accommodation – which they were not because there was none – "the interactive process broke down because [*Plaintiff*] failed to respond to [his] employer's request for more information. *Sinico v. Pennsylvania*, No. 22-2998, 2024 WL 510521, at *8 (3d Cir. Feb. 9, 2024). Thus, to the extent Plaintiff's failure to accommodate claim rests upon a supposed request for an accommodation after his return to work, the claim fails.

### iv.    Retaliation

Plaintiff finally avers that he was retaliated against for requesting a reasonable accommodation for his disability. To succeed on a retaliation claim in this context, Plaintiff must establish that (1) he engaged in protected employee activity; (2) he suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Broadnax*, 860 F. App'x at 804–05 (citing *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

The Court once again bifurcates its analysis between Plaintiff's two supposedly protected activities: (1) the denial of Plaintiff's request for light work accommodations made in February 2023 while on medical leave, and (2) the complaints about incision discomfort and Plaintiff's subsequent resignation in April 2023.

As to the former, Plaintiff took approved medical leave and, during that leave, Plaintiff requested to return to work with light duty accommodations. "Requesting an accommodation in good faith is a protected activity." *Kieffer v. CPR Restoration & Cleaning Servs., LLC*, 733 F. App'x 632, 639 (3d Cir. 2018) (citing *Shellenberger v. Summit*

*Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003).  As is taking medical or disability leave. *See Wright*, 822 F. App'x at 94.

Plaintiff's request to return to work with light duty restrictions was denied and Plaintiff was forced to instead stay on medical leave, during which he was paid less than while working.  A tangible adverse employment action may include an action that "inflicts direct economic harm" or causes "a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998).  Finally, there is sufficient evidence from which a jury could infer a causal link.  Temporal proximity between the protected activity and the adverse action is sufficient to establish a causal link where it is "unusually suggestive of retaliatory motive." *Jones v. Serv. Elec. Cable TV, Inc.*, 809 F. App'x 105, 110 (3d Cir. 2020).  Here, Plaintiff made the accommodation request while on protected leave and it was promptly denied.  Plaintiff filed a grievance through his union on March 2, 2023, and Ms. Mosley denied the grievance that same day.  [Pl.'s SMF ¶¶ 68, 69.]  The Court finds that there are genuine disputes of material fact as to Plaintiff's retaliation claims insofar as it relates to his request for light work accommodations.

As to the latter, however, the Court has already found that Plaintiff made no request for an accommodation in connection with his incision discomfort after he returned to work without restrictions.  *See supra* Section IV.B.iii.  As a result, there is no evidence that he engaged in protected activity.  The Court has also found that, even if he had requested an accommodation, Plaintiff suffered no adverse employment action because his resignation was not a constructive discharge.  *See supra*

Section IV.B.ii.  Therefore, to the extent Plaintiff's retaliation claims under the ADA and the NJLAD are premised upon any purported protected activity after Plaintiff returned to work with no restrictions, those claims fail and must be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED, IN PART, AND DENIED, IN PART**.  The Motion for Summary Judgment is **GRANTED** as to Counts I, II, and III in their entirety.  The Motion for Summary Judgment is **DENIED** as to Counts IV and V insofar as they allege a failure to accommodate Plaintiff's request for light work accommodations only and retaliation for requesting light work accommodations only.  The Motion for Summary Judgment is **GRANTED** as to Counts IV and V in all other respects.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

DATED: August 29, 2025

31